JOSE CANO ET UX. *v.* CENTRAL VERMONT RAILWAY CO.

May Term, 1929.

Present: WATSON, C. J., POWERS, SLACK, MOULTON, and WILLCOX, JJ.

Opinion filed October 1, 1929.

*Horace H. Powers* for the defendant.

*Deane C. Davis* and *John W. Gordon* for the plaintiffs.

WATSON, C. J. The place of the fire in question was in plaintiffs' pasture and wood land, located along and adjoining the right of way of the Central Vermont Railway Company, between Montpelier and Barre, on its westerly side and near what is known as Barre or Williamstown Junction, situated some more than a mile from the station at city of Barre. From that junction there is another line of track on the right-hand or westerly side, which connects with the main line track, and which goes to Williamstown. The point of this junction with the main line is on the westerly side of Winooski River and nearly opposite Jones Brothers' granite sheds on the other side of the river; and near this junction is a siding or spur track on the easterly side of the main track, to which siding or spur track granite stone chips and grout were drawn from stone sheds in Barre, by the switching engine in Barre yard, to be dumped over the bank.

The plaintiffs' said land adjoins defendant's right of way for about three miles, being separated from it by a wire fence. On some parts of this land, cedar trees had grown of different sizes, many suitable for fence posts, and some large enough for telephone poles and the like. In the winter of 1925-26, plaintiffs had a large number of such posts and poles cut and piled in various places on said land. Plaintiffs' evidence tended to show that at the time of and by the fire in question, not less than

3,500 of the posts thus cut and piled, nor less than 200 of the poles thus cut and piled, were destroyed.

At the close of all the evidence, defendant moved a verdict be directed in its favor on the grounds:  (1) That the evidence, construed most strongly in favor of the plaintiffs, had failed to show a cause of action; and (2) that defendant, as a matter of law and as a matter of fact, had discharged its statutory duty.

No evidence was introduced on the part of plaintiffs, in their opening case, tending to show the particular day on which the fire occurred; their evidence, however, was all subject to the construction that it was in April, 1927.  But the day of its occurrence was later definitely shown by defendant as April 11, of that year.  Plaintiffs introduced no further evidence on that question.  After defendant had thus shown the exact day of the fire, the trial seems to have been conducted by both parties on the theory that this was the true day; and neither party was injured by the action of the court in this respect.  No further attention will be given to Articles V and VI of defendant's brief.

That the time of the fire was in the forenoon of the day, all the witnesses testifying thereon agreed; but they varied somewhat in the hour from shortly before eight o'clock to the middle of the forenoon, most of them placing it somewhere between the hour first named and nine o'clock.

Plaintiffs' evidence tended to show that at the time the fire occurred the snow there had been gone about three weeks, the ground was dry, and there were bushes and grass and small plants on each side of the wire fence.

The plaintiff, Jose Cano, testified that from his house to the railroad track at Barre Junction, was about half a mile; that the first he noticed anything of a fire, was about eight, or eight and one half, o'clock in the morning, at which time he observed a smoke, and soon saw that the fire was next to the railroad track; that he heard a train, drawn by a locomotive engine, pass on the railroad track between fifteen and twenty-five minutes before he saw the smoke; that when he saw the smoke, he started to see where the fire was; that when he reached the place of the fire, quite a piece of ground had burned over—how much the witness could not say; that he saw a lot of fire in the piles of posts and poles, and he started trying to stop it; that about three and one-half acres of land were burned over before the

fire, at the end of about two hours, was brought under control; that the tracks of the fire showed that it burned over the ground both sides of the fence next to the railroad right of way; that the posts and poles destroyed were all on plaintiffs' land, and burned beyond use. ''Q. Limiting it within two months before the fire, had you seen sparks that came from the engine? A. Yes. Q. What had you observed during the winter months immediately preceding this fire as to sparks on the snow and where these poles were? A. Yes. Q. Did you say you did see cinders, etc., that had come from the engine? A. Yes, put it afire three times before this.'' The testimony of this plaintiff thus taken down in the form of answers to interrogatories, was received subject to the same objection as is stated below and is disposed of in connection with the testimony of the witness Theriault.

In cross-examination, this plaintiff testified that he never saw any tramps around in that neighborhood, nor did he ever see anybody light a fire on plaintiffs' land, nor on the railroad right of way; that a strong wind was blowing at the time of this fire, from the railroad track towards plaintiffs' land, ''up towards the top.''

One Columbo, a witness called by plaintiffs, testified that he was in the employ of defendant, and had been for four years as a section hand; that as such employee his duties consisted in putting in ties, walking track, and second boss once in a while; that during the month of April, 1927, it was part of his duties to walk a portion of the spur track and main line track running out of Barre on the defendant railroad to Montpelier; that on the morning of this fire witness walked the track from Barre station toward Montpelier three miles down to Intercity Park, so-called, and three miles back, six miles; that as he then walked down the track, there was no fire on the right of way and none on plaintiffs' land near Barre Junction; that when witness walked back up the track to that place, there was a fire there, which had got over onto plaintiffs' land; that he then saw ''a fire started there or going,'' and he went to put it out—grass and small trees were burning; that when he got there, the grass near the fence and next to the railroad track ''was already burned,'' and up across from the fence the fire was still burning. The witness being asked to tell what time he first noticed the fire, answered, ''I imagine around ten o'clock or so.'' Being recalled by defendant, this witness said he imagined his

attention was first called to it a little after nine o'clock. He testified that he saw no one else at the point where the fire was until he got back there; that he remained there working until the fire was all out.

Defendant's section foreman at the time of this fire, his section extending from a point three miles south of Dodge's bridge up to Barre, testified that the fire in question was near his section; that on the morning of the fire he was working about 125 feet toward Barre from Barre Junction, and that the yard limit was about 300 feet from the junction point toward Montpelier; that he saw the shifting engine (391) when it came from Montpelier the morning of and before the fire, but only once in that forenoon; that the fire was all where the cedars had been cut.

Plaintiffs' witness, one Theriault, a section hand, who had worked for defendant in that capacity for two years, off and on, at the time of the fire, and on the morning of the fire had been working near its location, testified that he saw two steam locomotives that morning, although in cross-examination he said it possibly was the same locomotive twice passing the place where the fire occurred, in effect, the second time by backing down to let the gas electric unit go up through. The same witness further said that engine 391 had come through from Montpelier a short time before he noticed the fire, and this train, other than the Williamstown train, was the only train noticed by him that morning before the fire occurred; that he had been working in the vicinity of this junction point all the morning; that he had seen trains at that same place on other occasions during the year next before this fire; that there was then the same locomotive engine on this branch line from Montpelier to Barre, drawing the freight trains, as was drawing the freight train in the same direction over that line on the morning of the fire in question, and before it was noticed; that apparently the beginning of the fire was down next to the railroad track.

This witness having testified that when his attention was first called to the fire, he saw dense smoke of all colors, further stated: "Q. How much black smoke did you see? A. That depends on the amount of coal the engine threw over there. Q. Did you see any coal? A. Yes. Q. Where? A. In that area. Q. Quite a lot? A. No, there might have been small pieces of coal burning. Q. Burning when you got there? A. Yes,

sir. Q. And fire all around them? A. In the middle, I saw some coal burning in the middle of that big fire. Q. And you were close enough to see those coals burning in the middle of that big area? A. Yes, sir. Q. Did someone call your attention to those pieces of coal? A. No, sir. * * * Q. You watched it go right by them, did you? A. As I was going by I was beating it out with the shovel, I had a hard time to blow them out, to extinguish the fire. Q. And you extinguished the fire all around them, did you, I mean this fire you testified about, these live coals, you put that all out with the shovel? A. Yes, sir.'' The witness further testified that a pretty hard northwest wind was blowing from the track back onto this land where the fire was.

This witness further testified that during the year next before this fire, he was working all along that track; that he had seen trains at the junction point on other occasions during the year previous to this fire. He was then asked whether or not he had ''seen those trains shooting cinders out of the smoke stack.'' Objection was made to the question on the ground that it was not proper to introduce testimony about what had happened in regard to cinders, live coals, on a previous occasion, unless it be shown that the circumstances were similar and the equipment was that which was involved in this case.

The court suggested to the examining attorney that the question should be limited as to time, and in view of the fact that probably there were only a very limited number of engines used on this branch, it might be possible for the witness to identify the particular engines; and that it would be better to do it in that order.

Thereupon plaintiffs' attorney waived the pending question, and examined the witness along the lines suggested by the court: That two engines were being used on the branch line about that time, a passenger and a ''switcher''; the passenger train had a particular engine to draw it, and was the one that came down from Barre and went to Williamstown; that the so-called ''switcher'' was the engine that carried the freight trains; that the two trains described by the witness as the ones which passed this piece of land at the junction previous to this fire, were the same two engines described by the witness in testifying.

The witness was then asked with reference to those two engines, whether or not during the period of a year previous

to the occasion of this fire, the witness had observed those engines at times emitting sparks or cinders out of the stack. The witness answered, ''I had.'' In effect, on request of defendant's counsel, defendant was then allowed an exception on the ground before stated.

Since the tendency of this evidence was that the engine drawing the freight train was the same—namely, No. 391, on each of the occasions referred to by the witness, there was no error in the ruling. This holding is equally applicable to the similar question raised in connection with the testimony of plaintiff Jose Cano.

The witness was then asked: ''Q. How many times had you noticed that during the year previous to the fire? A. Several times. Q. Was there any particular place where you had noticed it in particular? A. Yes, sir. Q. Where? A. If we had our shirts off during haying, we would get cinders on our back. * * * Q. What year? A. Any year, your Honor.'' Being asked to tell the different places where he had noticed this, witness said any certain point where he was working. Being asked whether he had noticed it down in the vicinity of where this grade is at the junction, said he had noticed it in the winter on the snow, cinders flying; that the grade he had already testified about, is opposite a portion of this land that was burned over; that he had seen the cinders over on the plaintiffs' pasture land itself, when snow was there, during the year previous at least to this fire.

Plaintiffs' witness, Attilio Campo, testified that he lived at 445 North Main Street in Barre; that he moved there sometime in March or first of April, 1928, previous to which he lived for ten years at No. 26 Willey Street in city of Barre; that he knows where defendant's railroad tracks cross Willey Street, which is about 50 feet from Anderson & Friberg stone shed, and that stone shed is about 300 feet from his house; that he knows where plaintiffs' said pasture and wood land is situated with reference to the railroad tracks which meet at Barre Junction; that when living on Willey Street he kept his cow in plaintiffs' said pasture for four years, and used to go and get her himself; that he remembers a fire occurred on that land in 1927; that he kept his cow in that pasture both before and after the fire; that he remembers seeing the posts and poles piled on this land as he went through it after the cow; that he believes there were about 40 or

50 piles, some smaller and some larger, in different piles. In cross-examination he said he saw the posts and poles there the fall before the fire, and there were around 40, 50 or 60 piles. In redirect examination the witness testified that when living on Willey Street, and especially during the year next before this fire, he saw "passenger trains, freight trains with stone," running on the railroad track; that the railroad track was in sight from his house; that drawing those trains were what are called steam engines; that during some of those times he saw sparks coming out of the smoke stack of some of the engines. The same objection was made to this last evidence as had already been stated to previous testimony of similar character, and exception allowed; but as the objection to which reference was last made has now been held unavailing, this exception is not again noticed. The witness said that this was in the fall of 1926, before the fire; that at the time he was holding his cow so she would not be scared at the train on the bridge near the Anderson & Friberg stone shed, where there was an underpass. In recross-examination the witness was asked: "Q. This underpass you have just told about where these sparks came down on your cow, were you down under the underpass? A. No, I wasn't under the track, I was one side, between the underpass and the Anderson stone shed."

Defendant's witness Earle (one of the chief dispatchers of defendant railway company) testified that he was in such position and so acting for defendant in 1927; that it is a part of his duty as such to govern the movement of trains on the road, to issue train orders, and to receive information about the movements of trains, to be informed at all times what trains are operated and where and through means of what equipment, and to keep an accurate record thereof each day; that defendant's Exhibit A is a train sheet, kept in the regular course of business, which shows the movement of all trains on the third district of the northern division on April 11, 1927, in which district is included the Montpelier and Barre branch and the Williamstown branch of defendant railway company, and shows what engines operated on those branches on the day last named. This exhibit was introduced in evidence by defendant subject to exception, but as the verdict was in favor of plaintiffs, they have not brought their exception here.

The testimony of witness Earle further tended to show that locomotive engine No. 391, drawing freight train extra 391 from Montpelier to Barre on the morning of April 11, left the former place at 7.20 o'clock, passed Barre Junction at approximately 7.40, and reached Barre at 7.45; that this was the only freight train which was run there that forenoon; that locomotive engine 391 burned coal; that all other trains which went by Barre Junction on the morning of April 11, were operated with what is known as the gas electric car; that there is quite an upgrade going from Dodge's bridge to Barre Junction, and from the latter place it is down grade into Barre; that freight train extra 391, as run from Montpelier to Barre that morning, had 18 cars, 10 loaded and 8 empties; that this was not necessarily all the engine could pull over that height; that it was about 700 tons, not the full engine rating; that defendant company has no record whatever as to the time that the switcher engine 391 moved back and forth in Barre, as long as its movements were confined to the yard limits; that there was no switching done at Barre on the morning of this fire, except by engine 391; that the same engine was the one which drew grout from the stone sheds, to be dumped on the spur down by the Barre Junction, if any was drawn that day.

A. Lapine, defendant's witness, testified that he was a boiler maker, and worked for defendant railroad company in its shops at St. Albans, and worked at same business in same place in March, 1927; that a work sheet of engine No. 391 was marked as Deft's Ex. B., which shows that 391 was inspected at said shops on March 12, 1927, and certain repairs then made thereon; that said work sheet is an original record the witness was required by the rules of the management to make and file with officials of the company, all of which was done by the witness in that instance. So much of said record as was in the handwriting of the witness was put in evidence without objection. The witness, then using Deft's Ex. B. to refresh his memory, testified that on the day named above, he worked on the ash pan, front end, grates, and so much of the entire boiler as took in his work; that he repaired the spark arresters so they were in proper working condition; that at the same time the ash pan was keyed up tight; that when 391 left said shop after being thus repaired as to ash pan and spark arresters, its condition was good.

The witness said in cross-examination that the spark arrester consisted of a screen, the rest being nothing more than the draft; that the screen "is made up of wire about an eighth of an inch in diameter," and "the holes through the screens are nettings so close together that there is about $\frac{3}{16}$ of an inch opening between each one of the wires. You could just about get a match through them"; that the purpose of it is to let the smoke out and to keep any particles of coal or fire from coming out; that if the screening is in proper condition, no fire will come out. "Q. That is correct, isn't it? A. Yes, sir." In re-direct examination, the witness said that he did not wish to give the impression that no cinders would get through the mesh of a netting if the spark arresters fit tight, but that "no cinders big enough to set any fire," would get through. "Q. But it is perfectly possible for cinders to get through that netting? A. They must be very small."

Record and parol evidence was also introduced by defendant, showing that engine 391 was inspected at the Montpelier engine house every twenty-four hours during the month of April, 1927. If on such inspection any trouble was found with the engine, it was repaired.

H. Nowell, defendant's witness, testified that he is and was in the year 1927, the mechanical superintendent of the defendant company, and as such had charge of the maintenance of the locomotives and cars, the operation of the engine house—all engine houses on the system, and the supervision of the engineers and firemen and mechanics that are used in the maintenance of the equipment; that he had held such position since May 1, 1920; that the equipment used on engine 391 in 1927, for the arresting of sparks, is the same method employed for such purpose by all, or substantially all, of the principal railroads that run in or into New England, and some others mentioned by the witness as within his knowledge. In cross-examination he testified: "Q. As I understand you, do you mean to claim that no sparks, live sparks can get through this screening? A. I didn't say so. Q. Then live sparks could go through this screening so as to communicate fire? A. Very minute sparks. Q. Well, big as a match isn't so awful minute, is it? A. I did not say that a spark as big as a match would go through. Q. What do you say as to being $\frac{3}{16}$ of an inch in size? A. That would be unusual. Q. If sparks got through there that would

burn a man's back if it stuck on him, it would be sufficient, wouldn't it, to set fire to dry leaves? A. I should think so. Q. And if this engine was in proper condition and this screen, at the time this fire occurred, there wouldn't be sparks of that size going through it, would there? A. I don't think so." This witness further testified in redirect examination that the age of engine 391 was approximately 30 years; that the approximate life of an engine, in actual use, is 30 to 40 years; and that 391 has "just about" reached its expectancy of life.

From the foregoing evidence given by the different witnesses, the following material circumstances appear, tending to show that the fire in question was communicated by locomotive engine No. 391. On the morning of, and before, the fire, engine 391 drew the freight train, extra 391, from Montpelier to Barre. It left the former place at 7.20 and made the run in twenty-five minutes. It passed Barre Junction at approximately 7.40. Extra 391 contained 18 cars, 10 of which were loaded and 8 empty, in all weighing about 700 tons. This was not the full engine rating, nor necessarily all it could pull; but for about three miles before reaching the junction named and up to that point, there was quite an upgrade, and the engine had "just about" reached the time of its life expectation. Defendant introduced no evidence tending to show that the train was not a heavy one for the engine drawing it. The ground about the junction, and in plaintiffs' adjoining pasture was dry, and on each side of the wire fence were bushes and grass and small plants. Soon after "extra 391" passed this junction, smoke was seen near the junction point, and on going to put the fire out, it was seen that it apparently started next to the railroad track, and that the ground on both sides of the wire fence had burned over. Engine 391 burned coal, and coal, pretty certainly emitted from the smoke stack of that engine, was found burning "in the middle of that big fire" in plaintiffs' pasture at the time of working at its extinguishment. There was no evidence tending to show that this burning coal could have got there from any other source or in any other manner. Two or three witnesses testified to seeing sparks and cinders of fire emitted by that same locomotive in the same general locality, at different times within the year next preceding the occurrence of this particular fire, and of sufficient size to burn a man's back if they struck on him, and sufficient to set fire to dry leaves;

and according to the testimony of Jose Cano, "during the winter months immediately preceding this fire" he saw cinders, etc., that had come from the engine, which "put it afire three times before this."

■ From this review of the material circumstantial evidence, "construed most strongly in favor of plaintiffs," as specified in the first ground of the motion for a verdict, it cannot well be said that plaintiffs failed to show a cause of action by evidence sufficient to carry the case to the jury. *Ide* v. *Boston & Maine R. R.*, 83 Vt. 66, 74 Atl. 401. Consequently there was no error in overruling this ground of the motion. *Van Dyke* v. *Grand Trunk Ry. Co.*, 84 Vt. 212, 78 Atl. 959, Ann. Cas. 1913A, 640.

■ The second ground of the motion was, "that defendant, as a matter of law and as a matter of fact, had discharged its statutory duty." In this respect the burden of proof was shifted from plaintiffs to defendant by statute. G. L. 5256; *Huntley* v. *Rutland R. R. Co.*, 83 Vt. 180, 74 Atl. 1000; *Ide* v. *Boston & Maine R. R., supra; Van Dyke* v. *Grand Trunk Ry. Co., supra.* Defendant introduced evidence tending to show that it was free from negligence in the construction and condition of engine No. 391, as to spark arresters and ash pan, on the morning of this fire. We may assume this to have been so— although defendant's mechanical superintendent, in cross-examination as a witness called in defense, cast some doubt on the matter—yet, defendant introduced no evidence tending to show that on the morning in question it did not place engine 391 in charge of unskilful and imprudent persons, or that the management of the engine was not in an unskilful and imprudent manner. Defendant did not, therefore, perform its full statutory duty, and the second ground of the motion was properly overruled. *Cleaveland* v. *Grand Trunk Ry. Co.*, 42 Vt. 449; *Farrington* v. *Rutland R. R. Co.*, 72 Vt. 24, 47 Atl. 171; *Ide* v. *Boston & Maine R. R., supra.*

This, in effect, disposes of all the questions presented in argument, and no error is found.

*Judgment affirmed.*